1

2

3

4

5

6                        UNITED STATES DISTRICT COURT
                        WESTERN DISTRICT OF WASHINGTON
7                                 AT SEATTLE

8   BRIAN THOMAS STARK,

9                          Petitioner,              Case No. C14-1538-JCC-MLP

10          v.                                      REPORT AND RECOMMENDATION

11  DANIEL WHITE,

12                         Respondent.

13

14                      **I.      INTRODUCTION**

15          Petitioner, a state prisoner who is currently confined at the Washington Corrections

16  Center in Shelton, Washington, seeks relief under 28 U.S.C. § 2254 from a King County

17  Superior Court judgment and sentence. Having carefully considered the parties' submissions, the

18  balance of the record, and the governing law, the Court recommends that Petitioner's habeas

19  petition be DENIED, a certificate of appealability be GRANTED in part and DENIED in part,

20  and this action be DISMISSED with prejudice.[1]

21

22

23  _____
    [1] Petitioner's request for oral argument is DENIED. The parties have thoroughly briefed the issues and oral
    argument would not be of assistance to the Court. *See Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998) (court
    may deny request for oral argument when parties submit briefs to the court).

    REPORT AND RECOMMENDATION - 1

## II.    BACKGROUND

### A.  Basis for Custody

In 2010, a jury convicted Petitioner of attempted first-degree child molestation (Count I), first-degree child molestation (Count II), first-degree incest (Count III), and third-degree child molestation (Count IV), all involving his stepdaughter C.W. (Rec. 1 (Dkt. # 48-1) at 1046-58.) On collateral review, the Washington State Court of Appeals ("Court of Appeals") vacated the conviction for Count I based on the statute of limitations. (Rec. 2 (Dkt. # 48-2) at 577.) On March 24, 2017, the King County Superior Court resentenced Petitioner on the remaining three counts. (Rec. 1 at 1060-71.) For Count II, the court imposed an indeterminate life sentence under RCW 9.94A.507 with a 125-month minimum term, and for Counts III and IV, the court imposed concurrent terms of 61 months and 54 months, respectively. (*See id.*)

### B.  Summary of Facts Presented at Trial

On collateral review, the Court of Appeals summarized the facts presented at trial as follows:

> C.W. was born in [] 1993 to Danelle Stark and Sam Steffey. Danelle met Brian Stark in 1999. They moved in together in January 2000, had a son together in September, and married in April 2001. They first lived in Auburn and then in Renton.
>
> The State based count I on C.W.'s testimony about an incident in the family's Renton home. She stayed home sick from school one day when she was in first grade during the 1999-2000 school year. While she was alone with Stark, he took off her underwear and looked at her vagina.
>
> The family moved to Spanaway, in Pierce County, in August 2000. C.W. testified that Stark molested her four times per week at this home. Because those incidents occurred outside King County, the State did not charge based on them, but the trial court admitted evidence of these incidents to show Stark's lustful disposition toward C.W.
>
> The family built a house in Maple Valley in 2003. They stayed in Danelle's parents' home in Renton during construction. Once they moved into the new

house in early 2004, C.W. testified that Stark started molesting her again. She reported that this abuse happened once every six months.

C.W. testified about one occasion a few months after they had moved into their new house when she was 10 years old. Stark molested her in a house still under construction. She testified that her cousin Jeffrey, Stark's nephew, was visiting their family. He was a few years older than C.W. She testified that Stark, Jeffrey, and she went for a bicycle ride as the sun was going down. Nearby they saw a half-built house. Stark told Jeffrey to go back to the Starks' house and then took C.W. into the half-constructed house. He took her up the stairs and into a hallway, backed her into a corner, pulled down her pants and underwear, and rubbed her vagina. She did not report the incident to her mother, brother, or Jeffrey because she was afraid of Stark. The State based count II on this incident.

Stark testified that he never rode his bike with C.W. and Jeffrey, never went into the half-built house alone with C.W., and never had any sexual contact with C.W. Danelle testified that Jeffrey occasionally visited them in their new house but that he did not visit during the first few months they lived there and did not ride a bicycle or have access to one.

C.W. also testified about a different occasion when she was 11 or 12. Stark came into her room while she was on her bed watching television, took off her pants and underwear, and licked her vagina. The State based count III on this incident.

The State based count IV on C.W's testimony that before she started ninth grade Stark pinned her down on a couch, removed her clothing, and tried to have intercourse with her. He gave up when she fought him.

C.W. disclosed Stark's abuse to her family and friends on several occasions.

Danelle testified that when C.W. was 11 or 12 years old, she told Danelle that C.W.'s grandfather talked to her about inappropriate touching, that C.W. thought Stark had touched her body or leg while she slept, but that she might have been dreaming. Her mother did not report the incident because she did not believe C.W. was reporting abuse. C.W. testified that this conversation occurred when she was 7 or 8 years old and that she did not actually think she had been dreaming.

C.W.'s cousin A.H. testified that she was close to C.W. and that C.W. had called her in December 2007 to tell her that Stark was molesting and raping her and also that she hated living at home. A.H. told C.W. that she needed to do something about it, and C.W. responded, "Please don't tell . . . . I don't want to get in trouble. I don't want to start family problems." A.H. told C.W. that she had to get her mother, Lori Neilson, C.W.'s aunt, involved. C.W. then disclosed the abuse to Lori. She also disclosed the abuse to Nancy Weiss, her maternal grandmother.

C.W. went to stay with Nancy. During C.W.'s stay, Nancy discussed the abuse with her, telling C.W. that she had to be absolutely sure that everything she said was the truth. C.W. said that it was. C.W. did not give Nancy much detail but said that Stark put his penis inside her. Nancy also testified that C.W. was having a difficult time at home with the many restrictions imposed on her. No one disclosed the abuse to the authorities after C.W.'s disclosure. C.W. returned to Danelle and Stark's home because C.W. missed her mother and brother.

C.W.'s best friend, K.J., testified that on January 1, 2009, early in the morning after a New Year's Eve gathering, she and C.W. were in K.J.'s room playing on the computer. K.J. suggested to C.W. that they visit a "Post a Secret" website. C.W. spent about five minutes writing out her secret on a piece of paper. At K.J.'s urging, she shared it with K.J. The paper read, "He's molested and raped me since I was six. Just don't try to save me. My mom wouldn't listen anyways." K.J. asked C.W. who she wrote about, and C.W. started crying. K.J. asked if it was C.W.'s boyfriend at the time, and C.W. shook her head. K.J. asked if it was Stark, C.W. nodded, and they both cried. C.W. asked K.J. not to tell anyone, and K.J. agreed. But K.J. shared what C.W. had disclosed with her mother, Robin Jordan. K.J. testified that C.W. had also shared the information of the abuse earlier with two other friends, Matt and Jake.

Robin talked with C.W. about two weeks later. Robin testified that when she confronted C.W., C.W. immediately broke down and cried. C.W. did not offer details but answered questions about a few specifics. Robin got the impression that C.W. was afraid of what Robin would think.

In April 2009, K.J. and her mother reported C.W.'s disclosures to a school counselor, Michael Hansen. He spoke with C.W. K.J. testified that C.W. cried during the interview. Hansen was a mandatory reporter and notified the police. Hansen testified that he had completed a Child Protective Services report and that C.W. had reported multiple sexual assaults by Stark between the age of 6 and the age of 14. Michael Sutherland, the school resource officer, also interviewed C.W. about the abuse. C.W. did not cry but got emotional several times as if she were about to cry. C.W. gave him the names of several people she had disclosed the abuse to and detailed accounts of several incidences of abuse, though she jumped around chronologically.

C.W. testified that she had disclosed the abuse to her friends Matt and Jake sometime before the incident when Stark molested her on the couch.

Stark testified that he never molested C.W.

(Rec. 2 at 563-68.)

### C.  Procedural History in State Court

Petitioner's direct appeal was unsuccessful. In 2015, he timely filed a personal restraint petition with the Court of Appeals. A three-judge panel granted the petition as to Count I, which the State had conceded was barred by the statute of limitations, and remanded for resentencing. The court rejected Petitioner's other claims. Petitioner sought discretionary review by the Washington Supreme Court. While the motion for discretionary review was pending, the trial court resentenced him.[2] The Washington Supreme Court Commissioner ("Commissioner") denied review. Petitioner sought to modify the Commissioner's ruling, which the Washington Supreme Court denied without comment.

Petitioner filed a direct appeal of the 2017 judgment and sentence. The Court of Appeals affirmed in part, reversed in part, and remanded for the trial court to strike two community custody conditions and to amend a third condition. Petitioner filed a petition for review, which the Supreme Court denied without comment.

In 2018, while the appeal from his new sentence was pending, Petitioner filed a second personal restraint petition with the Court of Appeals. The Court of Appeals granted the State's motion to dismiss the petition as successive. Petitioner filed a motion for discretionary review, which the Commissioner dismissed. The Washington Supreme Court denied Petitioner's motion to modify the Commissioner's ruling without comment.

### D.  Procedural History in Federal Court

Petitioner initiated the instant action *pro se* in October 2014. (Dkt. # 1.) The original petition raised 12 grounds for relief from the 2010 judgement and sentence, but it contained both exhausted and unexhausted claims. In 2015, the Court granted Petitioner's motion to stay and

---

[2] Petitioner filed a motion in the Washington Supreme Court to amend the personal restraint petition so it would apply to the 2017 judgement on resentencing. The Commissioner denied the motion.

1   abey the proceedings while he attempted to exhaust state remedies. (Dkt. # 18.) In 2018, the

2   Court granted Petitioner's motion, filed through counsel, to supplement his original petition with

3   five additional grounds. (Dkt. ## 36, 39.) On June 11, 2019, following completion of the state-

4   court proceedings, the Court lifted the stay and directed the parties to submit additional briefing.

5   (Dkt. # 47.) On August 13, 2019, Petitioner filed a Memorandum in Support of Writ, in which he

6   withdrew a number of claims and clarified the remaining claims. (Mem. (Dkt. # 49).)

7   Respondent filed an Answer and Memorandum of Authorities and the state court record. (Ans.

8   (Dkt. # 50); Rec. 1; Rec. 2; Rec. 3 (Dkt. # 48-3).) Petitioner filed a traverse (Trav. (dkt. # 53)),

9   and at the Court's request, Respondent filed a supplemental brief (Supp. (dkt. # 55)). The matter

10   is now ripe for review.

### III.   GROUNDS FOR RELIEF

12   The remaining claims in this action may be stated as follows:

13
14   **Claim 1**: Trial counsel provided ineffective assistance by failing to interview and subpoena Petitioner's nephew, Jeffrey Stark, to rebut C.W.'s testimony regarding Count II.

15   **Claim 2(a)**: Jury Instruction 22 relieved the State of its burden of proof.

16   **Claim 2(b)**: Trial counsel was ineffective for failing to object to Instruction 22.

17   **Claim 2(c)**: Appellate counsel was ineffective for failing to challenge Instruction 22 on direct appeal.
18

19   **Claim 3**: The prosecutor committed misconduct in his rebuttal argument by commenting that the defense could have called Jacob Wagener and Matthew Purvine as witnesses but chose not to do so.

20   (Mem. at 20-30 (Claim 1), 30-34 (Claims 2(a), 2(b), 2(c)), 34-37 (Claim 3).) There is no dispute

21   that Petitioner properly exhausted his state remedies by presenting these claims to the

22   Washington Supreme Court in his motion for discretionary review concerning his first personal

23

1  restraint petition. (Ans. at 9.) In addition, Petitioner does not seek an evidentiary hearing. (*See*

2  *generally* Mem.; Trav.)

## IV.    STANDARD OF REVIEW

Under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), a habeas corpus

petition may be granted with respect to any claim adjudicated on the merits in state court only if

(1) the state court's decision was contrary to, or involved an unreasonable application of, clearly

established federal law, as determined by the Supreme Court, or (2) the decision was based on an

unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d).

In considering claims pursuant to § 2254(d), the Court is limited to the record before the state

court that adjudicated the claim on the merits, and the petitioner carries the burden of proof.

*Cullen v. Pinholster*, 563 U.S. 170, 181-82 (2011); *see also Gulbrandson v. Ryan*, 738 F.3d 976,

993 (9th Cir. 2013). "When more than one state court has adjudicated a claim, [the Court

analyzes] the last reasoned decision." *Barker v. Fleming*, 423 F.3d 1085, 1091-92 (9th Cir. 2005)

(citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991)).

Under § 2254(d)(1)'s "contrary to" clause, a federal court may grant the habeas petition

only if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a

question of law, or if the state court decides a case differently than the Supreme Court has on a

set of materially indistinguishable facts. *See Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).

Under the "unreasonable application" clause, a federal habeas court may grant the writ only if

the state court identifies the correct governing legal principle from the Supreme Court's

decisions, but unreasonably applies that principle to the facts of the prisoner's case. *See id.* at

407-09. The Supreme Court has made clear that a state court's decision may be overturned only

if the application is "objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 69 (2003). The

Supreme Court has further explained that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

Clearly established federal law, for purposes of AEDPA, means "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." *Lockyer*, 538 U.S. at 71-72. This includes the Supreme Court's holdings, not its dicta. *Id.* "If no Supreme Court precedent creates clearly established federal law relating to the legal issue the habeas petitioner raised in state court, the state court's decision cannot be contrary to or an unreasonable application of clearly established federal law." *Brewer v. Hall*, 378 F.3d 952, 955 (9th Cir. 2004) (citing *Dows v. Wood*, 211 F.3d 480, 485-86 (9th Cir. 2000)).

With respect to § 2254(d)(2), a petitioner may only obtain relief by showing that the state court's conclusion was based on "an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (quoting 28 U.S.C. § 2254(d)(2)); *see also Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) ("[A] decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceedings."). The Court presumes the state court's factual findings to be sound unless the petitioner rebuts "the presumption of correctness by clear and convincing evidence." *Miller-El*, 545 U.S. at 240 (quoting 28 U.S.C. § 2254(e)(1)).

\\

\\

## V.     DISCUSSION

### A.  Claim 1 – Ineffective Assistance of Trial Counsel for Failure to Interview or Subpoena Witness

Petitioner claims trial counsel was ineffective because he failed interview or call Petitioner's nephew, Jeffery Stark, as a witness during trial.[3]

#### 1.  Legal Standards

The Sixth Amendment guarantees a criminal defendant the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668 (1984). Claims of ineffective assistance of counsel are evaluated under the two-prong test set forth in *Strickland*. Under *Strickland*, a defendant must prove that (1) counsel's performance was deficient and, (2) the deficient performance prejudiced the defense. *Id.* at 687.

With respect to the first prong of the *Strickland* test, a petitioner must show that counsel's performance fell below an objective standard of reasonableness. *Id.* at 688. Judicial scrutiny of counsel's performance must be highly deferential. *Id.* at 689. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* To prevail on an ineffective assistance of counsel claim, a petitioner must overcome the presumption that counsel's challenged actions might be considered sound trial strategy. *Id.*

The second prong of the *Strickland* test requires a showing of actual prejudice related to counsel's performance. To establish prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the

---

[3] To avoid any confusion, the Court will refer to Jeffrey Stark as Jeffrey.

1  outcome." *Id.* at 694. "That requires a 'substantial,' not just 'conceivable,' likelihood of a

2  different result." *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011) (quoting *Harrington v. Richter*,

3  562 U.S. 86, 104 (2011)).

4  While the Supreme Court established in *Strickland* the legal principles that govern claims

5  of ineffective assistance of counsel, it is not the role of the federal habeas court to evaluate

6  whether defense counsel's performance fell below the *Strickland* standard. *Richter*, 562 U.S. at

7  101. Rather, when considering an ineffective assistance of counsel claim on federal habeas

8  review, "[t]he pivotal question is whether the state court's application of the *Strickland* standard

9  was unreasonable." *Id.*; *see also Burt v. Titlow*, 571 U.S. 12, 15 (2013). "A state court must be

10  granted a deference and latitude that are not in operation when the case involves review under

11  the *Strickland* standard itself." *Richter*, 562 U.S. at 101. Thus, federal habeas review of a state

12  court's adjudication of an ineffective assistance of counsel claim is "doubly deferential."

13  *Pinholster*, 563 U.S. at 190 (quoting *Knowles v. Mirzayance*, 566 U.S. 111, 123 (2009)).

14  *2.  State Court Adjudication*

15  The Stark family moved into a new house in Maple Valley in January 2007 when C.W.

16  was 10. (Rec. 1 at 211-12, 236, 782.) C.W. testified that shortly after they moved in, while it was

17  still winter, her cousin Jeffrey came to visit. (*Id.* at 246-51.) Jeffrey was 12 or 13 years old at the

18  time. (*Id.* at 247, 675.) According to C.W., she, Jeffrey, and Petitioner went for a bike ride

19  around the neighborhood, which was a new development and had many houses under

20  construction. (*Id.* at 246-51.) C.W. testified that as it was starting to get dark, Petitioner told

21  Jeffrey to head back to their house and that he wanted to show her inside one of the partially

22  constructed homes on their block. (*Id.*) C.W. testified that Petitioner brought her inside the house

23  and up to the second floor, where he pinned her into a corner, pulled down her pants and

1  underwear, and rubbed her vagina. (*Id.*) C.W. testified that after Petitioner was done, they

2  returned home but that she did not tell her mother or Jeffrey what had happened because she was

3  scared of Petitioner. (*Id.*)

4  Petitioner testified that he remembered visiting construction sites with C.W. and her

5  younger brother but denied going into any partially built homes alone with C.W. and denied

6  having any sexual contact with her. (*Id.* at 794-95, 797-98.) Petitioner testified that Jeffrey never

7  visited their Maple Valley home while the neighborhood was under construction, never rode

8  bikes when he visited, and only visited with his parents for family holiday gatherings, such as

9  Christmas Eve and Easter. (*Id.* at 795-97.) Petitioner also testified there were no bicycles for the

10  kids to ride around the neighborhood, but he later confirmed that C.W. had a bicycle when they

11  first moved into the house. (*Id.* at 796-97, 841.)

12  Danelle Stark testified that when they first moved into the Maple Valley home, other

13  homes in the neighborhood were still under construction but they were completed within a few

14  months. (*Id.* at 674-75.) She testified that Jeffrey would come to visit with his parents or his

15  grandparents but that he did not stay at their house for the first few months they lived there. (*Id.*

16  at 674-76.) She also testified that she did not remember him ever riding a bicycle or having

17  access to one. (*Id.*)

18  In ruling on Petitioner's 2015 personal restraint petition, the Court of Appeals

19  summarized additional facts related to this ineffective assistance of counsel claim:

20  C.W. first reported the incident about the half-built house to the police and the
   prosecutor on April 23, 2009, including that Jeffrey had been riding bikes with

21  Stark and her just before Stark molested her. She again reported this event on
   June 24, 2010, in her defense interview with Stark's trial counsel, Brad Meryhew,

22  again mentioning Jeffrey. Stark reviewed that transcript and sent an e-mail to his
   trial counsel stating, "[A]lso now I don't like how she is trying to get my nephew

23  involved in this. [B]oy!"

At a meeting with Meryhew before trial, Stark and Danelle told Meryhew that he should interview Jeffrey. Stark gave Meryhew Jeffrey's parents' contact information so that Meryhew could contact Jeffrey. Danelle recalls this event. Meryhew said he would put both Jeffrey and his parents on the witness list. Meryhew interviewed Jeffrey's mother, Sharon, and briefly asked her about Jeffrey but did not ask for his contact information.

The State's trial memorandum stated that Jeffrey had been on the bike ride, and C.W. included him in her trauma narrative, referring to him only as her "cousin." Due to late disclosure of possible inconsistent statements made by C.W., the trial court recessed to allow Meryhew to reinterview Robin Jordan and K.J., who were present when C.W. read her narrative to them at a treatment session. Each witness discussed C.W.'s account of the events in the half-built house and her cousin's presence on the bike ride. Stark read the interview transcripts and e-mailed Meryhew, noting that there were differences in the stories regarding the construction site. During trial, Stark nudged Meryhew during C.W.'s testimony, telling Meryhew to contact Jeffrey. He repeated this request outside of the courtroom but cannot recall Meryhew's response.

Meryhew never contacted Jeffrey for an interview. He stated that he had "a vague idea that when his name came up that there might have been some external barrier to me contacting him, but I really do not know that for sure." He stated that he had no tactical reason not to contact him. Before and during the trial, Jeffrey lived in Washington state and was in constant contact with his parents.

[After the trial,] Jeffrey learned that C.W. had included him in her account of the incident in the half-built home. Jeffrey denied his presence during those events. Danelle asked Jeffrey for something in writing, and a few days later she received a letter in an envelope with [Jeffrey's] return address. It read,

> To whom it may concern,
>
> Approximately when I was 14 or 15 I stayed the night with my uncle Brian and he bought me a baseball mit[t] made by Nike at [T]arget and that night we watched tv and I slept on the couch and the next day I played with my little cousins outside, right out front, what I remember is Brian mowing the lawn and then I went home. The allegations that [C.W.] made are false because we never went on a bike ride and Brian never told me to go home. There was no home unbuilt that we went to and that is the truth. I will testify under oath that the allegations are false that I was not there and he never said that to me. [Signed Jeff Stark]

In July 2014, Jeffrey died.

1    (Rec. 2 at 569-71 (last alteration in original); *see also id.* at 228-30 (Danelle Stark Decl.), 231

2    (Letter).) The Court of Appeals rejected Petitioner's ineffective assistance of counsel claim,

3    concluding that Jeffrey's testimony would have been cumulative of evidence considered by the

4    jury and therefore Petitioner failed to establish prejudice under *Strickland*. (*Id.* at 571-74.)

5            The Commissioner also rejected the claim. (*Id.* at 652-54.) After setting forth the

6    *Strickland* standard, the Commissioner ruled that the letter was unauthenticated and inadmissible

7    under Washington law:

8            Mr. Stark's ineffective assistance claim is based on the proposition that Jeffrey
             would have testified that the victim was untruthful when she said that she rode
9            bicycles with Jeffrey on the day Mr. Stark allegedly molested the victim in a
             house that was under construction. But Jeffrey died of natural causes several years
10           after Mr. Stark's conviction. Danelle Stark, Mr. Stark's wife and the victim's
             mother, who has consistently supported her husband and disbelieved her
11           daughter's allegations, has produced what she claims to be a letter written by
             Jeffrey refuting the victim's assertion that she rode bicycles with Jeffrey on the
12           day she was molested.

13           This "letter" is undated, unsworn, and unnotarized. Mrs. Stark did not see Jeffrey
             write or sign the letter, and even if she had, she does not indicate that she is a
14           notary or that any other basis exists authorizing her to authenticate the writing.
             Jeffrey's mother, Sharon Stark, submitted a declaration signed under penalty of
15           perjury stating that she did not know about Jeffrey's alleged letter until recently.
             She admits that she did not see Jeffrey write or sign the letter. She states that she
16           saw the "letter" and that the handwriting and signature "could possibly" be
             Jeffrey's. Ex. 15. This equivocal statement is insufficient to authenticate the letter
17           under ER 901(b)(2). But even if the writing can be authenticated, it is an out-of-
             court statement "offered in evidence to prove the truth of the matter asserted," and
18           thus is classic hearsay. ER 801(c). Mr. Stark does not show that Jeffrey's
             purported letter is exempt from the hearsay rule under either ER 803 or ER 804 or
19           any other exemption.

20           Mr. Stark also relies heavily on Danelle Stark's declaration, which asserts that
             Jeffrey told her that the victim's story about the unfinished house was false. This,
21           too, is classic hearsay not admissible under any exception to the hearsay rule. ER
             801(c); ER 803; ER 804.

22
             Although the Court of Appeals ultimately rejected Mr. Stark's ineffective
23           assistance claim on the merits, it did not address whether Jeffrey's "letter" and
             Danelle Stark's declaration were competent evidence. They were not, for reasons

stated above. A personal restraint petitioner is not entitled to collateral relief, including a reference hearing, unless the petitioner supports his or her claims with competent evidence. *In re Pers. Restraint of Rice*, 118 Wn.2d 876, 886, 828 P.2d 1086 (1992). Here, assuming defense counsel should have interviewed Jeffrey Stark out of abundance of caution, Mr. Stark has failed to produce competent evidence that Jeffrey could have provided relevant and material testimony that would have been helpful to his defense. Mr. Stark's ineffective assistance claim necessarily fails for lack of evidentiary support.[4]

(*Id.* at 652-54.)

3.  *Standard of Review*

Petitioner argues that the Court should review Claim 1 *de novo* because the Commissioner never properly applied the *Strickland* test, instead discounting Jeffrey's letter as hearsay. (Mem. at 21.) Respondent counters that AEDPA deference is owed because Petitioner failed to support his claim with competent evidence that satisfied the *Strickland* prejudice standard. (Ans. at 22.)

The first step in determining whether AEDPA deference applies is to determine which state court decision is under review. *Amado v. Gonzalez*, 758 F.3d 1119, 1130 (9th Cir. 2014). As noted above, the Court must review the last reasoned state-court decision, *Ylst*, 501 U.S. at 804, which in this case was the Commissioner's ruling. The second step is to determine "whether the decision being reviewed is an adjudication on the merits." *Amado*, 758 F.3d at 1130. "[A]n adjudication on the merits is 'a decision finally resolving the parties' claims . . . that is based on the substance of the claim advanced, rather than on a procedural, or other, ground.'" *Kirkpatrick v. Chappell*, 926 F.3d 1157, 1170 (9th Cir. 2010) (quoting *Lambert v. Blodgett*, 393 F.3d 943,

---

[4] [Commissioner's footnote 2] The ineffective assistance claim based on failure to interview Jeffrey Stark is moot in a practical sense in any event. Mr. Stark's theory is based on the proposition that Jeffrey's testimony would have exonerated him. But as indicated, Jeffrey has passed away. Mr. Stark fails to show any possibility that Jeffrey's purported written allegations would be admissible at a new trial. Thus, on this issue, the court ultimately cannot provide Mr. Stark with effective relief.

REPORT AND RECOMMENDATION - 14

1    969 (9th Cir. 2004) (citation omitted)). AEDPA deference "does not apply when a state court

2    does not reach the merits of a federal claim." *James v. Ryan*, 733 F.3d 911, 914 (9th Cir. 2013).

3          "In the context of federal habeas review, the 'adequate and independent state grounds'

4    doctrine customarily distinguishes between adjudications 'on the merits' and dismissals on

5    procedural grounds, the latter of which are generally not subject to federal habeas review."

6    *Lambert*, 393 F.3d at 967. Courts have held that Washington's admissible evidence rule is an

7    adequate and independent state ground. *Cobray v. Miller-Stout*, 469 Fed. Appx. 558, 559-60 (9th

8    Cir. 2012) ("Washington state courts require a petitioner to substantiate his factual allegations in

9    his personal restraint petition by either citing to the record or by providing admissible evidence

10   outside the record. *See In re Rice*, 118 Wash. 2d 876, 828 P.2d 1086, 1092-93 (1992) (citing

11   Wash. R. App. P. 16.7(a)(2)(i)). This procedural bar is based on independent and adequate state

12   law."); *Williams v. Uttecht*, No. 12-5538, 2012 WL 6765355, at *5 - *6 (W.D. Wash. Nov. 19,

13   2012) (state court refused to consider merits of claim where court dismissed ineffective

14   assistance of counsel claim because petitioner had not provided affidavits from witnesses he

15   asserted counsel should have called, thus making it impossible to conclude that counsel's

16   representation was deficient or that there was a reasonable probability the outcome would have

17   been different); *Williams v. Payne*, No. 00-1199, 2006 WL 3469603, at *3 (W.D. Wash. Nov.

18   29, 2006) (Washington's admissible evidence rule constitutes an independent and adequate state

19   procedural rule).[5]

20         The Court looks to the state court's reasons for denying the federal claim to "determine if

21   the state court's adjudication was on the merits or procedural." *Amado*, 758 F.3d at 1131. In this

22   case, the Commissioner began his discussion by setting forth the *Strickland* standard. (Rec. 2 at

23

---

[5] Petitioner argues that *Rice* "possibly announced a rule that Washington Courts have not clearly and consistently applied" (Mem. at 27-28), but he fails to acknowledge or address the federal authority concluding otherwise.

652.) The Commissioner then explained why the letter was unauthenticated and inadmissible

hearsay. (*Id.* at 653-54.) After noting that the Court of Appeals rejected the claim on the merits,

the Commissioner cited *Rice*, 118 Wash. 2d at 886, for the proposition that a personal restraint

petitioner must support his claim with competent evidence and concluded that Petitioner's

"ineffective assistance claim necessarily fails for lack of evidentiary support." (Rec. 2 at 654.)

Petitioner argues it is not clear that the Commissioner relied solely on an independent state

ground when rejecting Jeffrey's statement because the discussion was, to some degree, woven

into a general discussion of *Strickland* prejudice. (Mem. at 26.) Although the Commissioner set

forth the *Strickland* standard, it appears to the Court that he did not adjudicate the merits of

Petitioner's claim because he based his decision on Petitioner's failure to comply with

Washington's admissible evidence rule.[6] Nevertheless, the Court need not definitely resolve the

issue because Petitioner is not entitled to habeas relief on Claim 1 even under *de novo* review, as

explained below.[7]

### 4.  *De Novo Review*

The Court focuses its *de novo* review on *Strickland*'s prejudice prong. To reiterate,

Petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional

errors, the result of the proceeding would have been different. A reasonable probability is a

---

[6] If the Commissioner's decision rested on an independent and adequate state ground, then Claim 1 would be procedurally defaulted. *See Coleman v. Thompson*, 501 U.S. 722, 729 (1991), *overruled on other grounds by Martinez v. Ryan*, 566 U.S. 1 (2012). However, by not raising procedural default in the Answer, Respondent has waived the defense. *See, e.g., Chaker v. Crogan*, 428 F.3d 1215, 1220 (9th Cir. 2005) ("[T]he state waived its procedural default defense by failing to raise the issue in response to Chaker's habeas petition.").

[7] Because the Court is reviewing Claim 1 *de novo*, it need not address Petitioner's challenges to the Commissioner's evidentiary ruling or his request to certify a question of Washington law to the Washington Supreme Court. (*See* Mem. at 24-29; Trav. at 7-10.) In addition, Petitioner's allegation that the Commissioner's treatment of his claim violated his federal constitutional rights (Mem. at 28-29; Trav. at 8-9) fails because "a petition alleging errors in the state post-conviction review process is not addressable through habeas corpus proceedings," *Cooper v. Neven*, 641 F.3d 322, 331-32 (9th Cir. 2011) (quoting *Franzen v. Brinkman*, 877 F.2d 26, 26 (9th Cir. 1989)), and Petitioner offers no persuasive reason to depart from this rule here.

probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

"That requires a 'substantial,' not just 'conceivable,' likelihood of a different result." *Pinholster*,

563 U.S. at 189 (quoted source omitted).

Petitioner argues that if Jeffrey would have testified at trial, he would have been a

"powerful, unbiased witness who could have contradicted C.W. on a key issue—that there was

never a bike ride or a half-built house." (Mem. at 24; *see also id.* at 30 ("He was the one neutral

person who was supposedly present, and his denial, on the witness stand, that there was no bike

ride and no half-built house would certainly have undermined confidence in the verdict.").)

Petitioner contends that Jeffrey's testimony would have bolstered both his own and his wife's

testimony, and diminished C.W.'s credibility. (*Id.* at 30.) He thus maintains that there is a

reasonable probability that at least one juror who heard Jeffrey's testimony would have reason to

doubt C.W.'s claims on all counts. (*Id.*)

Respondent counters by challenging the sufficiency of the letter purporting to be Jeffrey's

statement, citing the evidentiary flaws articulated by the Commissioner and noting that the letter

is undated and unsworn and no other person witnessed it being written or sent. (Ans. at 17-18.)

Respondent also argues that the letter is not relevant because C.W. and Jeffrey were describing

two different periods of time. (*Id.* at 18.) C.W. testified to an incident occurring at the half-built

house in January 2004 when she was 10 years old and Jeffrey was 12 or 13 years old,

Respondent points out, whereas Jeffrey's letter referred to events that occurred when he was 14

or 15 years old. (*Id.*) Respondent also contrasts C.W.'s testimony that it was getting dark outside

when the molestation occurred with Jeffrey's letter describing a trip to Target to purchase a

baseball mitt and playing outside with his cousins while Petitioner mowed the law. (*Id.*)

According to Respondent, these outside activities typically do not occur in January. (*Id.*)

1    Respondent also notes that Jeffrey's letter states he spent the evening watching television and

2    slept on the couch, which are events C.W. did not mention during her testimony. (*Id.*) Thus,

3    Respondent argues, even assuming Jeffrey's statements in the letter are true, they do not

4    contradict or impeach C.W.'s testimony, and therefore Petitioner cannot show prejudice from

5    counsel's decision not to interview or call Jeffrey as a witness. (*Id.* at 18-19.)

6        In his traverse, Petitioner argues that Jeffrey's letter is both relevant and admissible.

7    (Trav. at 3-10.) Petitioner maintains that Jeffrey's letter proves prejudice because it contradicts

8    C.W.'s testimony on almost every point, including the time of year and the recreational activities

9    he engaged in during his visit, and establishes that he never went bike riding and was never sent

10   home from a half-built house. (*Id.* at 4.) He also notes that C.W. testified the incident occurred in

11   "winter," not in January as Respondent stated in his Answer (Rec. 1 at 247), and argues that if

12   the weather was warm enough to ride bicycles, then it would have been warm enough to play

13   outside. (Trav. at 4 n.2.) Petitioner also contends that the letter is not inadmissible hearsay under

14   Washington law. (*Id.* at 6-7.)

15       Having carefully considered the record and the governing law, the Court concludes that

16   Petitioner fails to establish prejudice under *Strickland* because the letter is unauthenticated and

17   unsworn. (*See* Rec. 2 at 231.) "Unauthenticated, unsworn statements generally cannot carry a

18   habeas petitioner's burden to show *Strickland* prejudice." *Couturier v. Presiding Judge of the*

19   *L.A. Superior Court*, No. 16-8287, 2017 WL 3531498, at *9 (C.D. Cal. Jul. 6, 2017) (citing

20   *United States v. Ashimi*, 932 F.2d 643, 650 (7th Cir. 1991) ("evidence about the testimony of a

21   putative witness must generally be presented in the form of actual testimony by the witness or an

22   affidavit"); *United States v. Cockrell*, 720 F.2d 1423, 1427 (5th Cir. 1983) (ineffective assistance

23   is not shown if defendant fails to produce affidavit of uncalled witness); *Brown v. Swarthout*,

2011 WL 5975056, at *9 (C.D. Cal. Oct. 20, 2011), *adopted*, 2011 WL 5974672 (C.D. Cal. Nov. 29, 2011) (habeas petitioner's unsworn assertion "is not competent evidence")). In *Wheaton v. Kernan*, 288 Fed. Appx. 316 (9th Cir. 2008), the habeas petitioner sought to establish prejudice from his counsel's ineffective representation by presenting unsworn statements from a potential witness who had since died. *Id.* at 316. The Ninth Circuit noted that the petitioner "offered no explanation for the failure to obtain a sworn declaration or affidavit at a time when doing so was still possible."[8] *Id.* The court held that the petitioner's evidence fell short of satisfying his burden of presenting evidence "sufficient to establish what [the witnesses'] testimony would have been." *Id.* (quoting *Alcala v. Woodford*, 334 F.3d 862, 872 (9th Cir. 2003)); *see also Duncan v. Morton*, 256 F.3d 189, 201-02 (3d Cir. 2001) (where petitioner's "only evidence regarding the content of [the uncalled witness's] potential testimony [was] an unsworn letter," he could not establish prejudice resulting from counsel's alleged failure to interview that witness); *Dows*, 211 F.3d at 486 ("Dows provides no evidence that this witness would have provided helpful testimony for the defense—*i.e.*, Downs has not presented an affidavit from this alleged witness."); *Rolan v. Vaughn*, 445 F.3d 671, 682 (3d Cir. 2006) (a showing of *Strickland* prejudice "must be made based on the potential witness's testimony to the habeas court"). Based on this authority, the Court concludes that the unsworn letter in this case is inadequate to establish prejudice.[9]

Moreover, even if Jeffery testified to the contents of the letter, his statements are insufficient to create a substantial likelihood that Petitioner would have been acquitted on any count. C.W. clearly testified that the abuse alleged in Count II occurred shortly after her family

---

[8] Like in *Wheaton*, Petitioner offers no explanation for why he did not obtain an affidavit or declaration from Jeffrey. Jeffrey apparently wrote the letter in 2011, was diagnosed with cancer in January 2014, and passed away in the summer of 2014. (*See* Rec. 2 at 229-30.)

[9] Given this conclusion, the Court need not address Petitioner's arguments regarding hearsay.

moved into the Maple Valley home when she was 10 and Jeffrey was 12 or 13. C.W. also

testified that the neighborhood was still under construction, and Danelle Stark confirmed that the

neighborhood construction was completed within a few months of their move. Petitioner and

Danelle Stark both testified that Jeffrey did not visit during this time. Jeffrey's letter does not

confirm Petitioner's and Danelle Stark's testimony that he did not visit during this time. Rather,

he recounts a visit that occurred a year or two later when he was 14 or 15 and states they did not

go on a bike ride and visit a half-built home at this time. If Jeffrey had expressly stated that he

did not visit shortly after the family moved to Maple Valley, or if he had stated that he visited

while the neighborhood was under construction but did not go on a bike ride, then these

statements would have more directly undercut the State's evidence. But the content of the letter

is limited and insufficient to establish prejudice under *Strickland*.

      For these reasons, the Court recommends that Claim 1 be denied.

### B.  Claim 2(a) – Instructional Error

      Petitioner argues that Jury Instruction 22 relieved the State of its burden of proof in

violation of his Sixth and Fourteenth Amendment rights.

#### 1.  Legal Standards

      "In a criminal trial, the State must prove every element of the offense, and a jury

instruction violates due process if it fails to give effect to that requirement." *Middleton v.

McNeil*, 541 U.S. 433, 437 (2004). However, "not every ambiguity, inconsistency, or deficiency

in a jury instruction rises to the level of a due process violation." *Id*. Instead, the Court's review

in a jury instruction challenge is limited to determining whether an "ailing instruction so infected

the entire trial that the resulting conviction violates due process." *Estelle v. McGuire*, 502 U.S.

62, 72 (1991) (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)). In making this assessment,

1  the instruction "'may not be judged in artificial isolation,' but must be considered in the context

2  of the instructions as a whole and the trial record." *Id.* (quoting *Cupp*, 414 U.S. at 147); *see also*

3  *Duckett v. Godinez*, 67 F.3d 734, 745-46 (9th Cir. 1995) (the existence of a constitutional

4  violation depends on the evidence in the case and the jury instructions as a whole). Where an

5  instruction is ambiguous, the Court must "inquire 'whether there is a reasonable likelihood that

6  the jury has applied the challenged instruction in a way' that violates the Constitution." *Estelle*,

7  502 U.S. at 72 (quoting *Boyde v. California*, 494 U.S. 370, 380 (1990)). It is not enough that

8  there is some "slight *possibility*" that the jury misapplied the instruction. *Weeks v. Angelone*, 528

9  U.S. 225, 236 (2000) (emphasis in original).

10       Where a state court has rejected an instructional error claim on the merits, federal habeas

11  relief may be granted only if the state court's application of the foregoing law was objectively

12  unreasonable. *Waddington v. Sarausad*, 555 U.S. 179, 190 (2009). Since the due process

13  standard applied to claims of instructional error is a very general one, the range of possible

14  reasonable applications of that standard is substantial, and thus significant deference is given to

15  state court adjudications of such claims. *See generally Yarborough*, 541 U.S. at 664 (in assessing

16  whether state court's adjudication of a claim involved unreasonable application of clearly

17  established law, court must consider legal rule's specificity; the more general the rule, the more

18  leeway courts have in reaching outcomes in case-by-case determinations). In addition, even if a

19  trial court's jury instructions are constitutionally deficient, the Court cannot grant habeas relief

20  for such a trial-type error unless the petitioner suffered prejudice under *Brecht v. Abrahamson*,

21  507 U.S. 619, 637 (1993). *See Pulido v. Chrones*, 629 F.3d 1007, 1012 (9th Cir. 2010) (citing

22  *Fry v. Pliler*, 551 U.S. 112, 120 (2007); *Brecht*, 507 U.S. at 637); *see also Hedgpeth v. Pulido*,

23  555 U.S. 57, 61-62 (2008) (per curiam) (applying *Brecht* prejudice standard to habeas claims of

1    instructional error). "Under *Brecht*, an instructional error is prejudicial and habeas relief is

2    appropriate only if, after reviewing the record as a whole, [the Court concludes] that there was a

3    substantial and injurious effect or influence on the verdict, or if [the Court is] 'left in grave

4    doubt' as to whether there was such an effect." *Pulido*, 629 F.3d at 1012 (quoting *Kotteakos v.*

5    *United States*, 328 U.S. 750, 765 (1946)). Grave doubt exists where, "in the judge's mind, the

6    matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of

7    the error." *O'Neal v. McAninch*, 513 U.S. 432, 435 (1995).

8           *2.   State Court Adjudication*

9           Initially, neither party at trial proposed a jury unanimity instruction modeled on *State v.*

10   *Petrich*, 101 Wash. 2d 566 (1984), *overruled in part on other grounds*, *State v. Kitchen*, 110

11   Wash. 2d 403 (1988). (Rec. 1 at 814, 855.) After some discussion, however, both defense

12   counsel and the prosecutor proposed such instructions. (*Id.* at 855-859; Rec. 2 at 144, 147-49.)

13   The defense proposed an instruction that tracked WPIC 4.25's language:

14          The State alleges that the defendant committed acts of Child Molestation in the
     First Degree and Incest in the First Degree on multiple occasions. A separate

15          crime is charged in each count. To convict the defendant on the count of Child
     Molestation in the First Degree, one particular act of molestation must be proved

16          beyond a reasonable doubt, and you must unanimously agree as to which act has
     been proved. To convict the defendant on the count of Incest in the First Degree,

17          one particular act of sexual intercourse must be proved beyond a reasonable
     doubt, and you must unanimously agree as to which act has been proved. You

18          need not unanimously agree that the defendant committed all the acts of child
     molestation or incest. You must, however, find a separate and distinct act for each

19          count charged.

20   (Rec. 2 at 149.) The prosecutor proposed a different opening sentence: "Evidence has been

21   produced suggesting that the defendant committed acts of Child Molestation in the First Degree

22

23

and Incest in the First Degree on multiple occasions."[10] (*Id.* at 144.) The prosecutor provided the

following explanation for why he altered the WPIC language:

> Technically speaking, when you're looking at what the State has charged and
> what I told the jury in my opening statement and what has been my theory of the
> case all along, I really haven't alleged multiple acts occurring in King County of
> either Molestation in the First Degree or Incest in the First Degree.
>
> I think that the jury might possibly, through [defense counsel's] cross-
> examination of witnesses, other than [C.W.], conclude that there were other acts.
> But, you know, anything else, from my point of view, that [C.W.] talked about
> that could be considered Child Molestation in the First Degree or Incest in the
> First Degree is part of the 404(b) evidence that the Court admitted. [. . .] Because
> it occurred in Spanaway.

(*Id.* at 867-68.) Defense counsel did not object to the prosecutor's proposed instruction. (*Id.* at

869-70.) The final unanimity instruction read to the jury, Instruction 22, stated:

> Evidence has been produced suggesting that the defendant committed acts of
> Child Molestation in the First Degree and Incest in the First Degree on multiple
> occasions. A separate crime is charged in each count. To convict the defendant on
> the count of Child Molestation in the First Degree, one particular act of
> molestation must be proved beyond a reasonable doubt, and you must
> unanimously agree as to which act has been proved. To convict the defendant on
> the count of Incest in the First Degree, one particular act of sexual intercourse
> must be proved beyond a reasonable doubt, and you must unanimously agree as to
> which act has been proved. You need not unanimously agree that the defendant
> committed all the acts of child molestation or incest.

(Rec. 1 at 1042.)

  In his personal restraint petition, Petitioner argued the introductory sentence violated his

rights under the Washington Constitution and the Sixth and Fourteenth Amendments of the U.S.

Constitution. (Rec. 2 at 68-69.) The last reasoned decision on this issue is from the Washington

Supreme Court Commissioner, who ruled:

> Article IV, section 16 of the Washington Constitution provides that "[j]udges
> shall not charge juries with respect to matters of fact, nor comment thereon, but
> shall declare the law." "A statement by the court constitutes a comment on the

---

[10] The prosecutor also omitted the last sentence in defense counsel's proposed instruction, but this alteration is not at issue here.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

evidence if the court's attitude toward the merits of the case or the court's evaluation relative to the disputed issue is inferable from the statement." *State v. Lane*, 125 Wn.2d 825, 838, 889 P.2d 929 (1995). Here, the court prefaced its unanimity instruction with the following sentence: "Evidence has been produced suggesting that the defendant committed acts of Child Molestation in the First Degree and Incest in the First Degree on multiple occasions." Ex. 6 (Instruction No. 22). The instruction went on to advise the jury that a separate crime was charged as to each count and that to convict the defendant of any one charge, one particular act had to be proved beyond a reasonable doubt and that the jury had to unanimously agree as to which act had been proved.

The trial court's introductory instruction apprised the jury that the trial court could not comment on the evidence. Ex. 6 (Instruction No. 1). The instruction admonished the jury that if the trial court unintentionally commented on the evidence, it had to disregard the evidence. Consistent with the unanimity instruction, the jury was instructed that each count pertained to a separately charged crime and that the verdict as to one count should not affect the verdict on any other count. Ex. 6 (Instruction No. 4). The jury was further instructed that it was the State's burden of proving every element of each charged crime beyond a reasonable doubt. Ex. 6 (Instruction No. 5). And the "to convict" instruction as to each count instructed the jury that the elements of the charged crime had to be proven beyond a reasonable doubt and that if, after weighing all the evidence, the jury had a reasonable doubt as to any one element, it had to acquit the defendant. Ex. 6 (Instruction Nos. 11, 13, 17, 21). The jury is presumed to have followed these instructions. *State v. Johnson*, 124 Wn.2d 57, 77, 873 P.2d 514 (1994).

The trial court's introductory sentence in instruction No. 22 was not an obvious comment on the strength of the State's evidence or an explicit or implied assessment of the evidence. It did not resolve disputed factual issues, nor was it tantamount to a directed verdict. *State v. Becker*, 132 Wn.2d 54, 64-65, 935 P.2d 1321 (1997). Rather, it was an awkwardly worded statement to the effect that evidence was presented of the alleged crimes, not that it was strong, persuasive, weak, or anything other than evidence concerning the allegations against Mr. Stark. The term "suggesting" may have been unnecessary, but that alone does not rise to the level of a comment on the evidence. To the extent the prefatory sentence was problematic, Mr. Stark cannot show actual and substantial prejudice when the challenged sentence is viewed against the instructions in their entirety, the arguments presented, the competing theories of the case, and the strength of the evidence presented.

(*Id.* at 655-56.)

1

> 3. *Standard of Review*

2      Petitioner argues that the Court should review this issue *de novo* because the

3  Commissioner never addressed the proper federal test. (Mem. at 33.) "When a state court rejects

4  a federal claim without expressly addressing that claim, a federal habeas court must presume that

5  the federal claim was adjudicated on the merits . . . ." *Johnson v. Williams*, 568 U.S. 289, 301

6  (2013); *see also id.* ("if the state-law rule subsumes the federal standard—that is, if it is at least

7  as protective as the federal standard—then the federal claim may be regarded as having been

8  adjudicated on the merits"). That presumption may be rebutted in limited circumstances,

9  including when the state standard is less protective than the federal standard, the state and federal

10  standards are quite different, or the petitioner merely mentioned the provision of the U.S.

11  Constitution or federal precedent in passing in a footnote or in a string cite. *Id.* at 301-02

12  (although "presumption is a strong one that may be rebutted only in unusual circumstances, it is

13  not irrebuttable").

14      The *Johnson* presumption applies in this case because Petitioner brought state and federal

15  challenges to Instruction 22 but the Commissioner did not expressly address the federal claim.

16  Petitioner argues the Commissioner did not apply the "functional equivalent" of the federal

17  standard because the Commissioner concluded that even though Instruction 22 was awkwardly

18  worded, it did not comment on the strength of the State's evidence or resolve disputed factual

19  issues. (Trav. at 13 (quoting *Williams v. Filson*, 908 F.3d 546, 562 (9th Cir. 2018) (AEDPA

20  deference owed where state court applies "functional equivalent" of federal standard)).) But the

21  Commissioner's conclusion regarding the effect of the introductory sentence does not show that

22  the Commissioner failed to apply the equivalent of the federal standard. As noted above, a jury

23  instruction violates due process if it fails to require the State to prove every element of the

offense. *See Middleton*, 541 U.S. at 437. The Commissioner concluded that the introductory

sentence of Instruction 22 "was not an obvious comment on the strength of the State's evidence

or an explicit or implicit assessment of the evidence. It did not resolve disputed factual issues,

nor was it tantamount to a directed verdict." (Rec. 2 at 656.) Thus, the Commissioner determined

the instruction did not relieve the State of its burden of proving every element of the offense.

This conclusion is entitled to AEDPA deference.

### 4. *Federal Habeas Analysis*

Petitioner asserts several reasons why the opening sentence of Instruction 22 violated his

constitutional rights. First, he argues that the sentence amounted to a directed verdict or

mandatory presumption. (Mem. at 31-32 (citing, *inter alia*, *Carpenters v. United States*, 330 U.S.

395, 408-09 (1947) ("For a judge may not direct a verdict of guilty no matter how conclusive the

evidence."); *Carella v. California*, 491 U.S. 263, 265-66 (1989) (mandatory presumptions in jury

instructions foreclose independent jury consideration of whether facts establish certain elements

of charged crimes)).) Second, he contends the sentence conveyed to the jury that the judge

believed the State's evidence and that all the jury needed to do was to be unanimous as to which

time he committed the crime. (*Id.* at 31.) Third, Petitioner argues that because jurors are

presumed to have followed their instructions, the Court must assume the jurors took Instruction

22 to mean that the judge found that the evidence suggested Petitioner had in fact committed

child molestation and incest on multiple occasions. (*Id.* at 33.) Petitioner thus asserts that there is

a reasonable likelihood the jurors would have applied the instruction in a manner that relieved

the State of its burden of proof. (*Id.*)

Respondent counters that Petitioner inappropriately reads Instruction 22 in isolation.

(Ans. at 29.) Respondent points to the prosecutor's closing argument in which he made clear

1   which specific act pertained to each count. (Rec. 1 at 894-95.) Respondent argues that this

2   description of which specific acts pertained to which counts made it unlikely the jurors would

3   have focused on the first sentence of Instruction 22. (Ans. at 30.) Respondent further contends

4   there is no reasonable likelihood the jury believed that, by giving Instruction 22, the judge was

5   advising the jury that she believed Petitioner was guilty of the underlying crimes, had resolved a

6   contested factual matter, or had reduced the State's burden of proof. (*Id.* at 30-31.) Respondent

7   points to other jury instructions in which the trial judge admonished the jury to disregard any

8   comment she made that appeared to indicate her personal opinion about the evidence, advised

9   the jurors that they are the determiners of the facts, and instructed them that Petitioner was

10  presumed innocent and the burden was on the State to prove each element of each crime beyond

11  a reasonable doubt. (*Id.* at 31 (citing Instructions 1 and 5 (Rec. 1 at 1018-21, 1025)).) Given the

12  record as a whole, Respondent argues, Petitioner's jury instruction claim must fail.

13        In reply, Petitioner primarily argues that the more general jury instructions could not cure

14  the deficiency in Instruction 22 because jurors are presumed to have followed Instruction 22.

15  (Trav. at 11 (citing *Richardson v. Marsh*, 481 U.S. 200, 211 (1987) ("The rule that juries are

16  presumed to follow their instructions is a pragmatic one, rooted less in the absolute certitude that

17  the presumption is true than in the belief that it represents a reasonable practical accommodation

18  of the interests of the state and the defendant in the criminal justice process.")), 13.)

19        The Court concludes that the Commissioner's ruling on the jury instruction issue is not

20  contrary to or an unreasonable application of clearly established law. First, to the extent is it

21  proper for the Court to review the Commissioner's conclusion that Instruction 22 did not amount

22  to a directed verdict, *see Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("[A] state court's

23  interpretation of state law, including one announced on direct appeal of the challenged

conviction, binds a federal court sitting in habeas corpus."), the Commissioner's conclusion was reasonable. A jury instruction directs the verdict when it "instruct[s] the jury that the only contested element of the offense ha[s] been satisfied." *Powell v. Galaza*, 328 F.3d 558, 566 (9th Cir. 2003); *see also* Black's Law Dictionary (defining a directed verdict as "[a] ruling by a trial judge taking a case from the jury because the evidence will permit only one reasonable verdict"). Instruction 22, by contrast, only stated that evidence had been produced suggesting Petitioner committed the charged crimes.

Second, Petitioner's reliance on *Carella*, is misplaced. As the Ninth Circuit has explained,

> In *Carella*, the Supreme Court reiterated its rule that a mandatory presumption—a specific instruction that "both alone and in the context of the overall charge, could have been understood by reasonable jurors to require them to find the presumed fact if the State proves certain predicate facts"—violates the Fourteenth Amendment because it "directly foreclose[s] independent jury consideration of whether the facts proved establish[ ] certain elements of [the charged offense] . . . and relieve[s] the State of its burden of . . . proving by evidence every essential element of [the] crime beyond a reasonable doubt."

*Powell*, 328 F.3d at 563 (quoting *Carella*, 491 U.S. at 265-66, alterations in *Powell*). Instruction 22 did not amount to a mandatory instruction. As noted, it stated that evidence had been produced suggesting that Petitioner committed certain acts, but it also reiterated that a conviction required proof beyond a reasonable doubt. (Rec. 1 at 1042.) Thus, no reasonable juror would have understood the instruction to require them to presume any facts if the State proved certain predicate facts.

Third, even if the introductory sentence improperly commented on the evidence, there is no reasonable likelihood that the jury applied the instruction in a way that violated the Constitution. Petitioner correctly observes that jurors are presumed to have followed their instructions. *See Francis v. Franklin*, 471 U.S. 307, 324 n.9 (1985) ("The Court presumes that

jurors, conscious of the gravity of their task, attend closely to the particular language of the trial

court's instructions in a criminal case and strive to understand, make sense of, and follow the

instructions given them."). In Instruction 1, the trial judge informed the jury:

> Our state constitution prohibits a trial judge from making a comment on the evidence. It would be improper for me to express, by words or conduct, my personal opinion about the value of testimony or other evidence. I have not intentionally done this. *If it appears to you that I have indicated my personal opinion in any way, either during trial or in giving these instructions, you must disregard this entirely.*

(Rec. 1 at 1020 (emphasis added).) To the extent any juror read Instruction 22 as indicating that

the judge believed the State's evidence, as Petitioner argues, Instruction 1 specifically directed

the juror to disregard such an opinion. The instructions also directed the jury to "consider the

instructions as a whole" (*id.* at 2021), and jurors following this instruction would not have read

Instruction 22 in isolation. Furthermore, Instruction 5 stated that "[t]he defendant is presumed

innocent," and that the State had "the burden of proving each element of each crime beyond a

reasonable doubt." (*Id.* at 1025.) The instructions reiterated the reasonable doubt standard several

times, including in Instruction 22. (*Id.* at 1031 (Instruction 11, reiterating that each element of

Count II must be proved beyond a reasonable doubt to warrant a guilty verdict), 1041

(Instruction 21, same with respect to Count III), 1042 (Instruction 22, reiterating proof beyond a

reasonable doubt standard).) Viewing Instruction 22 in the context of the other instructions and

the record as a whole, there is no reasonable likelihood the jury applied the instruction so as to

relieve the State of its burden of proving every element. The Commissioner's ruling did not

unreasonably apply clearly established law, and Ground 2(a) should be denied.

\\

\\

### C. Claim 2(b) – Ineffective Assistance of Trial Counsel for Failure to Object to Instruction 22

Petitioner argues trial counsel provided ineffective assistance when he failed to object to Instruction 22. The Commissioner rejected this argument, concluding that Petitioner did "not show a reasonable probability that the verdict would have been different had counsel excepted to the instruction and the sentence was removed or altered." (Rec. 2 at 656.) The Commissioner explained:

> As indicated [with respect to the challenge to Instruction 22], the other elements of the unanimity instruction and the other instructions clearly and unequivocally stated the State's burden to prove beyond a reasonable doubt the elements of each of the charged crimes. Given the instructions, the arguments, and the compelling nature of the evidence, there is no reasonable probability that the jury would have acquitted Mr. Stark had the term "suggesting" been absent from the instruction.

(*Id.* at 656-57.) Petitioner's brief discussion on this issue (Mem. at 33-34; Trav. at 14) fails to establish that the Commissioner's adjudication of this issue unreasonably applied *Strickland*'s prejudice standard. Accordingly, Claim 2(b) should be denied.

### D. Claim 2(c) – Ineffective Assistance of Appellate Counsel for Failure to Challenge Instruction 22 on Direct Appeal

Petitioner argues appellate counsel provided ineffective assistance when he failed to challenge Instruction 22 on direct appeal. "A criminal defendant enjoys the right to the effective assistance of counsel on appeal." *Hurles v. Ryan*, 752 F.3d 768, 785 (9th Cir. 2014) (citing *Evitts v. Lucey*, 469 U.S. 387, 391-97 (1985)). Courts consider claims of ineffective assistance of appellate counsel under the *Strickland* standards set forth above. *Id.*

The Commissioner considered and rejected this claim:

> As indicated [with respect to the challenge to Instruction 22], there was no impermissible comment on the evidence, and thus there was no meritorious issue for appellate counsel to assert. But even if it can be argued that appellate counsel was deficient in not raising the issue, counsel would have had to demonstrate that the alleged comment on the evidence constituted a manifest error of constitutional

1
2
3
4
5
6
7
8
9
10

magnitude reviewable for the first time on appeal. RAP 2.5(a)(3). While a comment on the evidence is constitutional error, for it to be manifest in this instance, appellate counsel would have had to make a plausible showing that the error was prejudicial, meaning the error had practical and identifiable consequences in Mr. Stark's trial. *State v. Lamar*, 180 Wn.2d 576, 583, 327 P.3d 46 (2014). Mr. Stark cannot make that showing on this record. While the trial court might not have used the term "suggesting" had defense counsel excepted to the instruction, the term did not convey or imply an instruction to the jury to give particular weight to the State's evidence or that the evidence was credible, particularly when read in context with the entire instruction and other instructions. *Cf. Lamar*, 180 Wn.2d at 585 (trial court's failure to instruct reconstituted jury to begin deliberations anew after substitution of alternate jury and instructing jury instead to resume deliberating where it left off had practical and identifiable consequences because, if followed, erroneous instruction's effect was to prevent the reconstituted jury from deliberating in unison on all aspects of the case). In other words, there was no practical potential for the jury to be misled by the imprecise language. Mr. Stark cannot show prejudice arising from appellate counsel's failure to raise the issue because there is no reasonable probability that the Court of Appeals would have considered it for the first time on appeal.

11

(Rec. 2 at 657-58.) Petitioner argues appellate counsel's failure to raise this issue on direct

12

appeal prejudiced him because relief would have been granted given the more favorable standard

13

of review. (Mem. at 34; *see also* Trav. at 14.) Petitioner, however, fails to establish that the

14

Commissioner unreasonably applied *Strickland* by finding that he did not show prejudice. Thus

15

Claim 2(c) should be denied.[11]

16

**E.  Claim 3 – Prosecutorial Misconduct**

17

Petitioner challenges a statement the prosecutor made in his rebuttal during closing

18

arguments.

19
20
21
22
23

[11] In his traverse, Petitioner raises for the first time the argument that the ineffective assistance alleged in Claims 1, 2(b), and 2(c) should be reviewed for cumulative error. (Trav. at 14.) Cumulative error claims must be exhausted in the state courts before they can be raised in federal court. *See, e.g.*, *Wooten v. Kirkland*, 540 F.3d 1019, 1025-26 (9th Cir. 2008). Petitioner did not bring a cumulative error claim in the state courts, and therefore the Court will not consider such a claim here.

REPORT AND RECOMMENDATION - 31

1        *1.   Legal Standards*

2        When a prosecutor's conduct is placed in question, the standard of review is the "narrow

3   one of due process, and not the broad exercise of supervisory power." *Darden v. Wainwright*,

4   477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974)). To

5   succeed on a claim of prosecutorial misconduct, a petitioner must do more than show that "the

6   prosecutor's remarks were undesirable or even universally condemned." *Id.* at 180-81. A

7   petitioner must demonstrate that the prosecutor's allegedly improper remarks "so infected the

8   trial with unfairness as to make the resulting conviction a denial of due process."[12] *Id.* at 181

9   (quoting *Donnelly*, 416 U.S. at 643); *see also Smith v. Phillips*, 455 U.S. 209, 219 (1982) ("[T]he

10  touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of

11  the trial, not the culpability of the prosecutor.").

12       To assess a claim that a prosecutor's comments rendered a trial so fundamentally unfair

13  as to deny a petitioner due process, it is necessary to examine the entire proceedings and place

14  the prosecutor's statements in context. *See Greer v. Miller*, 483 U.S. 756, 765-66 (1987). In

15  addition, habeas relief can be granted only if the prosecutor's improper comments "had

16  substantial and injurious effect or influence in determining the jury's verdict." *Wood v. Ryan*,

17  693 F.3d 1104, 1113 (9th Cir. 2012) (quoting *Brecht*, 507 U.S. at 637).

18       *2.   State Court Adjudication*

19       During trial, C.W. testified that she first disclosed Petitioner's abuse to her friends Jacob

20  Wagener and Matthew Purvine. (Rec. 1 at 252-53, 307-08, 384-87.) She also testified that one

21  day she was sitting in a park with some boys, including Mr. Wagener, and Petitioner drove up,

22  got out of the car, and said, "If I see any of you with my daughter again, I'll F'ing kill you." (*Id.*

23

---

[12] *Darden* is the "clearly established Federal law" relating to a "prosecutor's improper comments" for purposes of
AEDPA review. *Parker v. Matthews*, 567 U.S. 37, 45 (2012) (per curiam) (internal quotation marks omitted).

at 375.) Petitioner testified he did not threaten Mr. Wagener but had seen him "making out" with

C.W. and told Mr. Wagener he did not want to see him around C.W. ever again. (*Id.* at 798.)

Neither side called Mr. Wagener or Mr. Purvine as witnesses.

Prior to closing arguments, the trial judge read the jury instructions to the jury. (*Id.* at

892, 1017-44.) The judge instructed:

> The lawyers' remarks, statements, and arguments are intended to help you
> understand the evidence and apply the law. It is important, however, for you to
> remember that the lawyers' statements are not evidence. The evidence is the
> testimony and the exhibits. The law is contained in my instructions to you. You
> must disregard any remark, statement, or argument that is not supported by the
> evidence or the law in my instructions.

(*Id.* at 1020.) The judge also instructed, "The State is the plaintiff and has the burden of proving

each element of each crime beyond a reasonable doubt. The defendant has no burden of proving

that a reasonable doubt exists. The defendant is presumed innocent." (*Id.* at 1025.)

During the State's closing argument, the prosecutor reiterated that the State had the

burden of proving guilt beyond a reasonable doubt. (*Id.* at 896.) The prosecutor did not mention

Mr. Wagener or Mr. Purvine, focusing instead on C.W.'s disclosures to other friends and the

credibility of her testimony. (*See id.* at 893-912.) During the defense's closing, Petitioner's

counsel also reminded the jury that "the defense doesn't have a burden to prove anything here;

it's the State that has to prove beyond a reasonable doubt that [the alleged crimes] happened."

(*Id.* at 917.) Counsel discussed at length C.W.'s inconsistent and equivocal allegations and the

credibility of her testimony. (*See id.* at 912-42.) Counsel also argued:

> Now, who you never heard from, the State didn't call them—remember, it's their
> duty to call witnesses, not mine. So, don't let them stand up here and say, "Oh,
> Mr. Meryhew [defense counsel] could have called them."
>
> But you didn't hear from Jacob Wagener, you didn't hear from Matthew Purvine,
> the two first people that she made disclosures to, whenever she made disclosures

> to them, talked to by the police. The State elected not to call them as witnesses in this case.
>
> No. They wanted to start at some point down the line, when she first talked to Ashley and Lori, and then to Robin and to Kailei. So, what those kids would say about what they were told you're not going to know. All you know is she said something to these kids at some point earlier on.
>
> . . .
>
> Did Brian threaten to kill the boys in the park? [C.W.] told you that he did. Brian said he didn't. And, unfortunately, we don't have Matthew Purvine and Jake Wagener here to tell you what they would have thought about that. But I would suggest to you that the idea that he threatened these neighborhood teenage kids with death is not a credible threat.

(*Id.* at 926-27, 937.)

In rebuttal, the prosecutor responded to defense counsel's arguments regarding Mr. Wagener and Mr. Purvine:

> Mr. Meryhew says don't let me get away with saying that, well, Mr. Meryhew could have called Jake Wagener and Matt Purvine to come in and talk to you. You know, had the defense not put on a case, that argument might make some sense.
>
> But the fact of the matter is they did put on a case, and these are two young men that if the defense thought they had anything helpful to say, I'm sure they would have put them on. That's not to say that there was any requirement that they do so. But they had the opportunity to do so, and they chose not to, just as the State had the opportunity to put them on and choose not to. All you know about them, ladies and gentlemen, is that [C.W.] said she told them.

(*Id.* at 945.) Defense counsel did not object to the prosecutor's comments. (*Id.*)

Petitioner challenged the prosecutor's statements in rebuttal on direct appeal, arguing that the statements improperly shifted the burden of proof to the defense in violation of his Fourteenth Amendment due process rights. (*Id.* at 1161-63, 1257-59.) The Court of Appeals rejected this claim without citing to the Fourteenth Amendment's Due Process Clause or federal caselaw:

1

Stark contends the deputy prosecutor committed reversible misconduct during
closing argument. He therefore bears the burden of establishing that the
challenged conduct was both improper and prejudicial.[13] Where, as here, the
defense fails to object to alleged misconduct, any claim of error is unreviewable
unless the comments were so flagrant and ill-intentioned that no instruction could
have cured the resulting prejudice.[14] We review misconduct claims in the context
of the total argument, the evidence addressed, the issues in the case, and the jury
instructions.[15]

2

3

4

5

. . .

6

7

Stark also contends the deputy prosecutor committed misconduct by invoking the
missing witness doctrine. During closing argument, defense counsel reminded the
jury about two potential witnesses who might have resolved a dispute in the
accounts of Stark and C.W. During rebuttal, the deputy prosecutor, without
objection, correctly noted that although the defense had no obligation to call any
witnesses, the defense also had the opportunity to call the witnesses.

8

9

10

"Remarks of the prosecutor, even if they are improper, are not grounds for
reversal if they were invited or provoked by defense counsel and are in reply to
his or her acts and statements, unless the remarks are not a pertinent reply or are
so prejudicial that a curative instruction would be ineffective."[16] Here, defense
counsel arguably invited or provoked the challenged comment by suggesting the
State did not call the potential witnesses because they would have undermined
C.W.'s testimony. But even if the comment was improper, a prompt objection and
curative instruction would have negated any potential prejudice. Stark has failed
to demonstrate reversible misconduct.

11

12

13

14

15

(*Id.* at 1278-80.)

16

       3.  *Standard of Review*

17

      Petitioner contends this Court should review his prosecutorial misconduct claim *de novo*

18

because the Court of Appeals' decision did not cite to any federal test for prosecutorial

19

misconduct and thus never analyzed the issue in light of the applicable federal principles. (Mem.

20

21

---

13 [Court of Appeals footnote 27] *State v. Cheatam*, 150 Wn.2d 626, 652, 81 P.3d 830 (2003).

22

14 [Court of Appeals footnote 28] *State v. Stenson*, 132 Wn.2d 668, 719, 940 P.2d 1239 (1997).

23

15 [Court of Appeals footnote 29] *State v. Boehng*, 127 Wn. App. 511, 519, 111 P.3d 899 (2005).

16 [Court of Appeals footnote 31] *State v. Russell*, 125 Wn.2d 24, 86, 882 P.2d 747 (1994).

at 35.) Petitioner further argues the Court of Appeals' test is not the "functional equivalent" of the federal test. (Trav. at 15 (quoting *Williams*, 908 F.3d at 562 (AEDPA deference owed where state court applies "functional equivalent" of federal standard)).) The Court is unpersuaded. First, as Respondent points out, the Court of Appeals need not cite federal law:

> A state-court decision is "contrary to" our clearly established precedents if it "applies a rule that contradicts the governing law set forth in our cases" or if it "confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent." *Williams v. Taylor*, 529 U.S. 362, 405-406, 120 S. Ct. 1495, 146 L.Ed.2d 389 (2000). Avoiding these pitfalls does not require citation of our cases—indeed, it does not even require *awareness* of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them.

*Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam) (emphasis in original); *see also Mitchell v. Esparza*, 540 U.S. 12, 16 (2003) (per curiam) ("We have held that a state court need not even be aware of our precedents, 'so long as neither the reasoning nor the result of the state-court decision contradicts them.'" (quoting *Early*, 537 U.S. at 8)).

Second, the Court of Appeals' test *is* the functional equivalent of the federal standard for prosecutorial misconduct claims. In *Ruth v. Glebe*, the Honorable James P. Donohue considered Washington's prosecutorial misconduct test—which requires prejudicial misconduct when viewed in the context of the entire proceedings—and concluded it was "essentially the same as the *Darden* test." *Ruth v. Glebe*, No. 15-533-TSZ-JPD, 2016 WL 10894425, at *12 - *13 (W.D. Wash. Aug. 3, 2016), *R & R adopted*, 2016 WL 10894042 (W.D. Wash. Sept. 28, 2016), *aff'd*, 715 Fed. Appx. 644 (9th Cir. 2017). The Honorable Thomas S. Zilly adopted Judge Donohue's Report and Recommendation denying his habeas petition. 2016 WL 10894042, at *1-*2. The petitioner raised prosecutorial misconduct on appeal to the Ninth Circuit, and the court affirmed, holding that the state court's adjudication of that claim was not contrary to or an unreasonable application of clearly established federal law. 715 Fed. Appx. at 646. As in *Ruth*, the Court of

1  Appeals here set forth a legal standard that is equivalent to the clearly established federal law.[17]

2  (*See* Rec. 1 at 1278.) Therefore, the Court will review the state-court decision with AEDPA

3  deference. *See Johnson*, 568 U.S. at 301 ("if the state-law rule subsumes the federal standard—

4  that is, if it is at least as protective as the federal standard—then the federal claim may be

5  regarded as having been adjudicated on the merits" and the federal habeas court should apply

6  AEDPA deference).

7          *4.  Federal Habeas Analysis*

8        Petitioner argues that the prosecutor committed misconduct by making a "missing

9  witness" inference, which most jurisdictions only allow when the defense fails to call a "logical"

10  witness. (Mem. at 36 (citing *State v. Blair*, 117 Wn. 2d 479, 486 (1991)).) According to

11  Petitioner, neither Mr. Wagener nor Mr. Purvine were "logical" witnesses for him to call. (*Id.*)

12  Therefore, Petitioner asserts, any comment on the defense's failure to call these witnesses had

13  the effect of shifting the burden of proof by telling the jurors that the defense should have called

14  these witnesses and failed to produce evidence of his innocence. (*Id.* at 36-37.) He also argues

15  that because this case was a credibility contest between himself and C.W., the improper

16  argument infected the entire trial with unfairness. (*Id.* at 37.)

17        Petitioner, however, fails to establish that the Court of Appeals' adjudication of his claim

18  was unreasonable. The Court of Appeals reasonably concluded that the prosecutor's challenged

19  comments were made in response to defense counsel's suggestion that the State did not call Mr.

20

21                           
   [17] Although the state court in *Ruth* and the Court of Appeals in this case did not use the same language for the

22  prejudice standard, their tests were equivalent. As the Washington Supreme Court has explained, "[F]ailure to object
to an improper remark constitutes a waiver of error unless the remark is so flagrant and ill intentioned that it causes

23  an enduring and resulting prejudice that could not have been neutralized by an admonition to the jury. In other
words, a conviction must be reversed only if there is a substantial likelihood that the alleged prosecutorial
misconduct affected the verdict." *State v. Russell*, 125 Wash. 2d 24, 86 (1994) (internal citations omitted).

Wagener or Mr. Purvine because their testimony would have been unfavorable to the prosecution. An argument that is an "invited response" to defense counsel's remarks does not prejudice the jury. *United States v. Young*, 470 U.S. 1, 11-13 (1985) ("[I]f the prosecutor's remarks were 'invited,' and did no more than respond in order to 'right the scale,' such comments would not warrant reversing a conviction."); *see also United States v. de Cruz*, 82 F.3d 856, 863 (9th Cir. 1996) (holding prosecutor's improper rebuttal argument to be harmless in part because it was an invited response); *cf. Darden*, 477 U.S. at 182 (noting that "[m]uch of the objectionable content was invited by or was responsive to the opening summation of the defense"). Furthermore, the trial court instructed the jury that "the lawyers' statements are not evidence," that the State "has the burden of proving each element of each crime beyond a reasonable doubt," and that Petitioner had "no burden of proving that a reasonable doubt exists." (Rec. 1 at 1020, 1025.) The Court must assume in the absence of evidence to the contrary that the jury followed its instructions. *Weeks*, 528 U.S. at 234; *Richardson*, 481 U.S. at 206 (noting the "almost invariable assumption of the law that jurors follow their instructions"). Accordingly, the Court of Appeals' rejection of Petitioner's prosecutorial misconduct claim was not an unreasonable application of clearly established federal law, and Claim 3 should be denied.[18]

## VI.    CERTIFICATE OF APPEALABILITY

A petitioner seeking post-conviction relief under § 2254 may appeal a district court's dismissal of his federal habeas petition only after obtaining a certificate of appealability from a district or circuit judge. A certificate of appealability may issue only where a petitioner has made

---

[18] Even if the Court were to review Claim 3 *de novo*, it would not find reversible prosecutorial misconduct because defense counsel invited the prosecutor's response, the prosecutor's response was reasonable, and no reasonable juror would have believed Petitioner had the burden of proof given the brevity of the prosecutor's statement and the jury instructions. Therefore, considering the entire proceedings, the allegedly improper remarks did not infect the trial with unfairness such that Petitioner's conviction was a denial of due process.

REPORT AND RECOMMENDATION - 38

1  "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(3). A

2  petitioner satisfies this standard "by demonstrating that jurists of reason could disagree with the

3  district court's resolution of his constitutional claims or that jurists could conclude the issues

4  presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537

5  U.S. 322, 327 (2003). Under this standard, the Court concludes that a certificate of appealability

6  should be granted as to Claims 1 and 2(a) and denied as to his remaining claims.

## VII.    CONCLUSION

8       The Court recommends that Petitioner's habeas petition be DENIED, that a certificate of

9  appealability be GRANTED as to Claims 1 and 2(a) and DENIED as to the remaining claims,

10  and that this action be DISMISSED with prejudice. A proposed order accompanies this Report

11  and Recommendation.

12       Objections to this Report and Recommendation, if any, should be filed with the Clerk and

13  served upon all parties to this suit within **fourteen (14) days** of the date on which this Report and

14  Recommendation is signed. Failure to file objections within the specified time may affect your

15  right to appeal. Objections should be noted for consideration on the District Judge's motions

16  calendar for the third Friday after they are filed. Responses to objections may be filed within

17  **fourteen (14) days** after service of objections. If no timely objections are filed, the matter will be

18  ready for consideration by the District Judge on February 28, 2020.

19       The Clerk is directed to send copies of this Report and Recommendation to the parties

20  and to the Honorable John C. Coughenour.

21       Dated this 13th day of February, 2020.

22

23

                             MICHELLE L. PETERSON
                             United States Magistrate Judge